1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY BRADSHAW, an individual,<br><br>                      Plaintiff,<br><br>v.<br><br>WAL-MART ASSOCIATES, INC., a Delaware corporation; and DOES 1 through 20, inclusive,<br><br>                      Defendants. | Case No.:  23-CV-593 TWR (BLM)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 18) |

Presently before the Court is Defendant Wal-Mart Associates, Inc.'s Motion for Summary Judgment ("Mot.," ECF No. 18), as well as Plaintiff Ashley Bradshaw's Response in Opposition to ("Opp'n," ECF No. 31) and Defendant's Reply in Support of ("Reply," ECF No. 32) the Motion.  On December 5, 2024, the Court held a hearing on the Motion.  (ECF No. 34.)  Having carefully reviewed the Parties' arguments, the record, and the relevant law, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## BACKGROUND

Unless otherwise indicated, the following facts are uncontroverted. To the extent certain facts are not referenced in this Order, the Court has not relied on such facts in reaching its decision.  Additionally, pursuant to Section III.B.6 of the undersigned's Civil Standing Order, the Court only considers evidentiary objections presented in the

Opposition and Reply briefs. Accordingly, all evidentiary objections in the Parties' proposed Statements of Fact filed on August 1, 2024, (ECF No. 22-2), and August 30, 2024, (ECF No. 23-1), are **OVERRULED**.

## I.    Factual Background

### A.    *Defendant's Corporate Policies*

Defendant is a multinational retail corporation that operates a chain of grocery stores. (ECF No. 26 ("Jt. Stmt.") No. 2.) Defendant's corporate policies and procedures, including those relating to reasonable accommodations, are prepared, approved, and revised by Defendant's executive committees located in Bentonville, Arkansas. (*Id.* No. 5.)

Defendant divides geographical territories into "Regions." (*Id.* No. 6.) Each Region contains "Markets" that cover sub-areas within the Region. (*Id.* No. 9.) Each Market, in turn, contains stores within its domain. (*Id.* No. 12.) Defendant's Oceanside store (the "Oceanside Store"), where Plaintiff worked, was designated as store number 2494 and was located within Region 57 and Market 460. (*Id.* No. 77.) During Plaintiff's employment, Laura Kish was the Regional Director of Human Resources for Region 57, Marisela Fuentes-Uribe was the People Operations Lead for Market 460, Joseph Champey was the Oceanside Store Manager, Mariam Rizko was the Oceanside Store Asset Protection Assistant Store Manager, and Amanda Moreno was a People Lead (a human resources role) at the Oceanside Store. (*Id.* Nos. 78, 80, 82, 84, 86.)

#### 1.    *Policies Concerning Temporary Associates.*

Defendant employs part-time and full-time temporary associates based on its business needs. (*Id.* Nos. 15, 16.) Temporary associates undergo an onboarding process and orientation that includes training and information on Walmart's policies. (*Id.* No. 22.) Additionally, during the job offer process, temporary associates receive a Temporary Associate Welcome Letter, which details the terms of their temporary employment. (ECF No. 18-5 ¶ 6; ECF No. 18-6 at 1–4.)

/ / /

Prior to the COVID-19 pandemic, a temporary assignment could not last longer than 90 days or 180 days, depending on the nature of the assignment, and Defendant provided no guarantee to any temporary associate that their assignment would last the full 90 or 180 days.  (Jt. Stmt. No. 23.)  During the COVID-19 pandemic, Defendant permitted store management to keep temporary associates for up to 270 days, depending on Defendant's business needs.  (*Id*. No. 24.)

In making the decision to end a temporary assignment or to retain a temporary associate and convert their role into a regular part-time or full-time position, store management may consider several factors specified in the Temporary Associate Welcome Letter, such as the associate's job performance and the store's business needs, including the need to temporarily cover for regular associates who are out on an extended leave of absence.  (*Id*. Nos. 29, 30, 31, 35.)  When evaluating a temporary associate's job performance, store management considers a temporary assignment to be comparable to a probationary period in which the temporary associate is not subject to formal warnings, discipline, or performance evaluations.  (*Id*. No. 31.)  Although it is Defendant's policy not to consider a temporary associate with unsatisfactory job performance for conversion to a regular part-time or full-time associate position, (*id*. No. 33), it was Plaintiff's "understanding . . . that everyone was a temporary associate" and "then hired."  (ECF No. 30 at 12.)

Additionally, a store's ability to hire or retain temporary associates is guided by each store's "Headcount Guidance," which is defined in the store's budget and consists of the maximum number of associates, both temporary and regular, that a store may employ at any given time.  (Jt. Stmt. No. 37.)  Defendant monitors a store's "Active Headcount" (the total number of active temporary and regular associates) and "Active Temp Headcount" (the total number of active temporary associates).  (*Id*. Nos. 38, 50.)  Generally, to operate within Defendant's budget, a store's Active Headcount must be within approximately 97.5% to 102% of its Headcount Guidance.  (*Id*. No. 39.)  If the Active Headcount is above 102% of the Headcount Guidance, a store will not be able to hire new temporary associates

or convert existing temporary associates to regular associate positions, and it must take steps to reduce its Active Headcount. (*Id*. Nos. 40, 41.)

During COVID-19, Defendant tracked stores with a high number of temporary associates compared to the number of regular part-time or full-time associates who were out on a COVID-related leave of absence; these stores were referred to as "High Temp Stores." (*Id*. No. 51.) A High Temp Store was required to take steps to reduce its Active Temp Headcount either by ending temporary assignments or, if available under the budget, converting temporary associates to regular part-time or full-time associates. (*Id*. No. 52.) When a High Temp Store's Active Headcount exceeded 102% of its Headcount Guidance, however, the store could not convert a temporary associate to a regular part-time or full-time associate until both the Active Temp Headcount and the Active Headcount were sufficiently reduced. (*Id*. No. 53.)

### 2. *Accommodation and Leave Policies*

Defendant provides a reasonable accommodation to an associate if the accommodation will allow the associate to perform the essential functions of their job without creating an undue hardship for the company. (*Id*. Nos. 56, 57.) A reasonable accommodation may consist of a job adjustment, leave of absence, or transfer to an open position. (*Id*. No. 57.) Eligible associates may also take a personal leave of absence for numerous reasons, including reasons unrelated to a disability or medical condition. (*Id*. No. 65.)

Sedgwick, a third-party vendor, processes the majority of Defendant's associates' requests for accommodations and personal leaves of absence. (*Id*. Nos. 59, 66.) Once Sedgwick receives an associate's request for an accommodation, it will provide the associate with an accommodation packet containing a medical questionnaire and medical release. (*Id*. No. 61.) Sedgwick will then provide the associate's store with an e-mail notification indicating that the associate has made a request for an accommodation. (*Id*. No. 62.) Sedgwick asks associates who request accommodation based on a disability or medical condition, including pregnancy, to provide medical documentation supporting the

accommodation request.  (*Id*. No. 60.)  All medical documentation must be submitted through Sedgwick.  (*Id*. No 71.)  Sedgwick does not, however, disclose to store personnel, including the store manager, the specific medical condition or other medical information underlying the accommodation request; rather, Sedgwick will only inform the store of the accommodation requested and what specific work restrictions have been approved.  (*Id*. No. 64.)

An associate making a request for an accommodation based on a disability or a medical condition may be eligible for a Temporary Alternative Duty ("TAD") assignment. (*Id*. No. 72.)  A TAD permits the associate to continue to work in the TAD assignment until the associate reaches Maximum Medical Improvement ("MMI"), their restrictions are modified, or ninety days have passed.  (*Id*. No.  73.)  If one of these three events occurs, the TAD does not automatically expire; instead, the TAD remains in effect until management discusses the TAD with the associate and then formally revokes the TAD. (*Id*. No. 74.)

During the pandemic, Defendant introduced a new policy that permitted associates to take three types of COVID-related leave: (1) "Level 1," if an associate was uncomfortable with coming into work due to the pandemic; (2) "Level 2," if an associate had come into contact with someone with COVID; and (3) "Level 3," if an associate had a confirmed case of COVID.  (ECF No. 18-7 ¶¶ 29–32; ECF No. 18-4 at 253:11–17.)  Unlike Level 3, neither Level 1 nor Level 2 was based on a medical condition or disability.  (ECF No. 18-7 ¶¶ 30–32.)

While there is no guarantee that a temporary assignment will last the maximum duration, Defendant has a policy to toll time spent on an approved medical leave of absence—but not time spent on an approved personal leave of absence—from the duration of a temporary assignment.  (ECF No. 18-11 ¶¶ 13–14.)

/ / /

/ / /

/ / /

**B.    Plaintiff's Employment at the Oceanside Store**

        1.    *Defendant Hires Plaintiff at the Oceanside Store*

In May 2020, the Oceanside Store experienced an increase in COVID-related absences among its associates.  (Jt. Stmt. No. 88.)  Anticipating that the number of associates on a COVID-related leave of absence would increase substantially over time, Champey sought to employ temporary associates at the Oceanside Store to cover for regular associates who were out on COVID-related leaves of absence.  (*Id*. No. 89.)

On May 29, 2020, Plaintiff submitted a written application to work for Walmart. (*Id*. No. 90.)  On May 31, 2020, Defendant offered Plaintiff employment as a temporary associate in the role of a personal shopper at the Oceanside Store, which Plaintiff accepted. (*Id*. No. 91.)  The essential functions of Plaintiff's position included lifting up to 50 pounds without assistance, and Plaintiff was subject to the policies generally applicable to Defendant's temporary associates.  (*Id*. Nos. 95, 96.)

Around August 2020, Plaintiff informed Assistant Manager Lillian Esqueda that she planned to undergo back surgery and would need time afterwards to recover.  (*Id*. No. 97.) Esqueda asked Plaintiff how long it would take her to recover after the surgery and told Plaintiff she could apply for leave through Sedgwick.  (*Id*. No. 98.)  Esqueda also advised Plaintiff that her best option might be to resign and then re-apply for employment with Defendant as a temporary associate.  (*Id*.)  On August 4, 2020, Plaintiff voluntarily ended her temporary employment with Defendant.  (ECF No. 18-4 at 8:14–9:8, 11:7–18, 265.)

On September 15, 2020, Plaintiff submitted another application to return as a temporary associate in the role of a personal shopper.  (Jt. Stmt. No. 103.)  On September 28, 2020, Defendant offered Plaintiff employment as a personal shopper.  (*Id*. No. 104.) When Plaintiff returned to Oceanside Store as a temporary associate in September 2020, she did not undergo the orientation process meant for temporary associates because of the short time between her resignation and her re-hiring at the Oceanside Store.  (*Id*. Nos. 22, 107.)  At that time, Champey also anticipated that the Oceanside Store's regular associates

who took COVID-related leaves of absence would return within a few months as the COVID-19 pandemic improved.  (*Id.* No. 108.)

### 2.  *Plaintiff's Worker's Compensation Case and Her TAD Assignment as a Greeter*

On October 4, 2020, Plaintiff sustained an injury at work while bending down to pick up a case of water and hitting her head against a shelf as she was coming back up.  (Jt. Stmt. No. 111.)  On November 30, 2020, Plaintiff's doctor issued a work status report in connection with Plaintiff's worker's compensation case providing restrictions of no strenuous physical/mental activities and no lifting over 10 pounds (the "Work Status Report").  (*Id.* No. 118.)  The Work Status Report specified that the restrictions identified would remain in place until they were cleared.  (*Id.*)

Upon receipt of the Work Status Report, Rizko offered Plaintiff a TAD Assignment allowing her to work in the front of the Store as a greeter.  (*Id.* No. 120.)  On December 2, 2020, Plaintiff accepted the TAD by signing it, and Rizko assigned her to work as a greeter beginning on December 2, 2020.  (*Id.* Nos. 123, 124.)  In the greeter position, Plaintiff had access to a stool if she needed it.  (*Id.* No. 126.)

### 3.  *Plaintiff's Work Performance*

With respect to evaluating a temporary associate's job performance, store management considers a temporary assignment comparable to a probationary period in which the temporary associate is not subject to formal warnings, discipline, or performance evaluations.  (*Id.* No. 31.)  Correspondingly, there is no documentation of Plaintiff receiving any disciplinary reprimand or action from Defendant during her employment as a temporary associate.  (ECF No. 30-1 at 6:8–17.)

While Plaintiff stated in her declaration that "[she] was never disciplined and/or coached for performance issues while working at Defendant," (ECF No. 30-1:24–25), Champey and Rizko each testified to Plaintiff's poor job performance.  (ECF No. 18-4 at 171:22–23, 173, 188:18–189:21, 192, 205:22–206:17; ECF No. 18-9 ¶¶ 10–11.) Specifically, Rizko attested that Plaintiff, when working as a personal shopper, "was very

slow to complete her work tasks and often took too long to fulfill her job duties," (*id.* ¶ 10), and, when working as a greeter, "was hardly at her assigned post and could not stay on task." (*Id.* ¶ 11.) Rizko testified that this resulted in "customers and employees constantly [having] to ask for another person to assist." (*Id.*) After observing Plaintiff as both a personal shopper and greeter, Rizko "had multiple conversations with [Plaintiff] regarding her unsatisfactory work performance, but Ms. Bradshaw failed to improve." (*Id.* ¶¶ 10, 11.) Similarly, Champey testified that when Plaintiff was working at the health ambassador station, Plaintiff "was hardly at the post. We always had to find her." (ECF No. 18-4 at 171:22–23.) As a result, people "constantly had to buzz the button and ask for somebody to help. We talked to [Plaintiff] multiple times about it." (*Id.* at 188:23–25, 189:1.)

       4.    *Plaintiff's Leave of Absence for COVID-Related Reasons and First Request for Accommodation*

On January 6, 2021, Plaintiff contacted Sedgwick to request a leave of absence because she "live[d] with her grandmother and [couldn't] risk getting COVID." (ECF No. 18-4 at 82.) Although Plaintiff understood the difference between requesting a personal leave of absence and requesting medical leave, (Jt. Stmt. No. 150), she did not communicate to Sedgwick or to Defendant any other reason for requesting the leave of absence. (*Id.* No. 148, 150; ECF No. 18-4 at 82.) Nonetheless, Plaintiff asserts that her January 6, 2021, request was based on her doctor's instructions to take two weeks off because she had COVID symptoms and feared exposing her grandmother to COVID. (Opp'n at 9; ECF No. 30-1 at 50:6–51:5.)

By a letter dated January 12, 2021, Sedgwick approved Plaintiff's leave of absence from December 31, 2020, to February 28, 2021, with an estimated return date of March 1, 2021. (ECF No. 18-4 at 83; Jt. Stmt. No. 154.)

       5.    *Headcount Levels and Reduction Efforts*

On February 8, 2021, while Plaintiff was on her COVID-related leave of absence, Kish sent a list of High Temp Stores to various Market Managers, (*id.* No. 157), and

directed them to "dive in and determine how [to] reduce this team headcount." (*Id*. No. 162; ECF No. 18-12 at 27.) The list indicated that the Oceanside Store's Active Headcount was at 113.2% of its Headcount Guidance, (Jt. Stmt. No. 159), because of the return of regular associates from their COVID leaves of absence and the over-hiring of temporary associates prior to their return. (*Id*. No. 155.) Indeed, as of February 8, 2021, the Oceanside Store had 38 more temporary associates than it needed to cover for the regular associates on COVID-related leaves of absences. (*Id*. No. 160.)

On February 9, 2021, Fuentes-Uribe sent an email to Champey and Moreno with the subject line "2494 Temporary Associates Action" and a report compiled from Defendant's HRS data system, known as Workday (the "Workday Report"). (ECF No. 18-6 at 6; Jt. Stmt. No. 166.) The Workday Report had columns denoting the listed employee's name, facility number, date in which they entered the "supervisory organization," and the number of days they had been with the supervisory organization. (ECF No. 18-6 at 6.) Fuentes-Uribe sent Champey and Moreno the Workday Report so that they could consider the longest-serving temporary associates as first-in-line to end their temporary assignments. (Jt. Stmt. 164.) Fuentes-Uribe did not input, change, or in any way manipulate the information populated in the Workday Report. (*Id*. No. 167.)

The Workday Report identified Plaintiff by name, indicated that she entered the supervisory organization on May 31, 2020, and had been with the supervisory organization for 253 days. (ECF No. 18-6 at 6.) The Workday Report provided similar information on seven other employees in descending order by number of days with the supervisory organization. (*Id*.) Plaintiff was at the top of the Workday Report with 253 days in the supervisory organization, followed by two employees who had been in the supervisory organization for 185 days and five other employees who had been in the supervisory organization for 178, 161, 140, 130 and 111 days, respectively. (*Id*.)

On March 1, 2021, Kish distributed another list to various Market Managers, alerting them to the over-hiring of temporary associates and noting that the listed stores (including the Oceanside Store) had "20+ more [temporary associates]" than the number of regular

associates on a COVID-19 leave of absence.  (Jt. Stmt. Nos. 177, 182.)  By March 1, 2021, the Oceanside Store had made some progress in addressing its high Active Headcount and Active Temp Headcount, reducing its number of temporary associates from 49 to 36 and its total number of regular associates from 301 to 294, but still had 23 more temporary associates than it needed to cover for 13 regular associates who were out on COVID-related leave.  (*Id.* Nos. 179, 180.)

Ahumada, one of the Market Managers, forwarded Kish's email to Champey and requested that Champey "please send [him a] high overview by 1:30pm."  (ECF No. 18-6 at 8.)  Champey forwarded Ahumada's email to Moreno and requested that she provide Champey with the information needed to respond to Ahumada's email.  (Jt. Stmt. No. 184.) Moreno provided the following update to Champey:

> Temporary Associates
>
> 36 Temporary Associates
> 19 Associates on LOA
> 17 Temp Associates over HC Guidance
>
> All temporary associates are being evaluated for a permanent position or end temp assignment.

(ECF No. 18-4 at 231.)  Champey then responded to Ahumada on March 1, 2021, with the following information:

> Hi Boss,
>
> Temporary Associates
>
> 36 Temporary Associates, *1 being terminated tomorrow*.
> 19 Associates on LOA
> 16 Temp Associates over HC Guidance
>
> All temporary associates are being evaluated for a permanent position or end temp assignment.  Hiring is cut off.  We will also be scheduling part time hours to align total store schedules as we work through the conversions.

(ECF No. 18-6 at 8 (emphasis added).)

### 6.      *Plaintiff Returns to Work*

On March 1, 2021, Plaintiff returned to work from her personal leave and was in the "very early stages" of her pregnancy.  (Jt. Stmt. Nos. 176, 201.)  In her affidavit, Plaintiff states that on the day she returned to work, she informed Champey, Moreno, and Rizko that she was pregnant and had passed out twice because of her medical issues.  (ECF No. 30-1 at 51:8–16.)  Further, Plaintiff states that she "informed Human Resources of [her] medical note indicating [her] restrictions" and "asked Ms. Rizko if [she] could return to the greeter position as an accommodation."  (*Id*.)  Champey, Moreno, and Rizko, however, disavow any knowledge of Plaintiff's pregnancy on March 1, 2021.  (ECF No. 18-4 at 193:11–18; ECF No. 18-13 ¶ 6; ECF No. 18-9 ¶ 13.)

Prior to returning to work from her leave, Plaintiff did not communicate to Sedgwick or to Defendant that she would be returning to work on March 1, 2021.  (Jt. Stmt. No. 199.)  Defendant could not place Plaintiff on the schedule and asked her to go home and notify Sedgwick that she was returning to work, which caused Plaintiff to only work for four hours on March 1, 2021.  (*Id*. No. 200.)

On March 2, 2021, Plaintiff made another request for an accommodation through Sedgwick for pregnancy-related reasons.  (*Id*. No. 203; ECF No. 18-4 at 85).  On the same day, Sedgwick sent an email to the Oceanside Store and to Champey, which stated:

> This email is to notify you that, on 03/02/2021, your associate Ashley M. Bradshaw, called the Centralized Accommodation Program to request an accommodation, per the Accommodation in Employment *(Medical-Related) Policy.*
>
> • The associate is requesting the following accommodation: no lifting over 20 lbs, sit as needed, stool/chair, and Temporary Alternative Duty

(ECF No. 18-6 at 19; ECF No. 18-5 ¶ 34 (emphasis added).)

On March 3, 2021, Defendant initiated the administrative process to terminate Plaintiff's temporary employment.  (ECF No. 30-1 at 34:3–5.)  On March 4, 2021, Defendant completed the termination process, (*id*.), and Plaintiff received her separation

23-CV-593 TWR (BLM)

notice, stating "End of Temporary Assignment" as the reason for separation.  (ECF No. 18-4 at 280.)

## II.  Procedural Background

On March 1, 2023, Plaintiff filed a complaint against Defendant in the Superior Court of California, County of San Diego, alleging the following causes of action under the Fair Employment and Housing Act ("FEHA"), California Government Code §§ 12900–12996: (1) pregnancy-based discrimination, failure to accommodate, and failure to engage in the interactive process in violation of § 12940(a); (2) failure to prevent discrimination and harassment in violation of §§ 12940(j) and (k); (3) retaliation in violation of § 12940(h); (4) wrongful termination in violation of §§ 12940(a)–(o); and (5) wrongful termination in violation of public policy.  (*See generally* ECF No. 1-2 ("Compl.").)  On March 31, 2023, Defendant answered the Complaint, (*see generally* ECF No. 2), and removed the case to this District on April 3, 2023.  (*See generally* ECF No. 1.)

On June 27, 2024, Defendant moved for summary judgment on all of Plaintiff's claims and her request for punitive damages.  (*See generally* ECF No. 18.)  On August 1, 2024, Plaintiff filed her opposition, (*see generally* ECF No. 22), and on August 30, 2024, Defendant filed its reply, (*see generally* ECF No. 23).

On September 10, 2024, the Court ordered the Parties to file a joint statement of undisputed material facts pursuant to Section III.B.6 of the undersigned's Standing Order for Civil Cases.  (ECF No. 24.)  In response, Defendant filed (with Plaintiff's consent) an *ex parte* application for leave to update the Parties' memoranda of law and to extend the default page limits to add pinpoint citations to their evidence.  (ECF No. 25.)  With the Court's permission, (*see* ECF No. 27), the Parties filed their updated briefs, (*see generally* Mot.; Opp'n; Reply), and Plaintiff filed an updated Compendium of Evidence ("Updated Compendium of Evidence," ECF No. 30-1) on September 26, 2024.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary

judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit. . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *See Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts" that would allow a reasonable factfinder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Anderson*, 477 U.S. at 248. Accordingly, the

23-CV-593 TWR (BLM)

non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Id.* at 256.

## ANALYSIS

Defendant seeks summary adjudication of each of Plaintiff's causes of action and her claim for punitive damages. (*See generally* Mot.) Specifically, Defendant argues that Plaintiff cannot establish a prima facie case for discrimination based on her pregnancy or for retaliation based on her pregnancy-related accommodation request because Defendant—specifically, Champey—did not know about Plaintiff's pregnancy or accommodation request at the time Champey made the decision to terminate her. (*Id.* at 20:5–10, 24:1–2.) Further, several intervening events that explain the timing and basis of Plaintiff's termination negate the inference of causation. (*Id.* at 20:21–22, 24:10–11.) Second, even if Plaintiff could establish a prima facie case, Defendant's uncontroverted evidence shows that it terminated Plaintiff, an at-will temporary employee, because of her inadequate work and changes in Defendant's business needs, and Plaintiff cannot produce substantial responsive evidence to refute its proffered legitimate reasons for termination or show pretext. (*Id.* at 20:25–27.) Defendant argues that because Plaintiff's discrimination and retaliation claims fail as a matter of law, her derivative claims for wrongful termination and for failure to prevent discrimination necessarily fail as well. (*Id.* at 30:11–15.)

Additionally, Defendant argues that Plaintiff cannot establish her failure to accommodate and failure to engage in the interactive process claims because a TAD accommodation was in effect throughout her employment and because Defendant did engage in an interactive process in the time between Plaintiff's March 2, 2021 request and her unrelated March 4, 2021 termination. (*Id.* at 29:7–9; Reply at 11:4–6.)

Lastly, Defendant argues that Plaintiff's claim for punitive damages fails because there is no evidence that any of Defendant's officers, directors, or managing agents acted with malice, oppression, or fraud. (Mot. at 30:21–24.)

/ / /

/ / /

## I.     FEHA Retaliation (Claim 3) and Discrimination (Claim 1)[1]

When evaluating FEHA retaliation and discrimination claims at trial, in the absence of direct evidence of discriminatory intent, the parties' burdens of persuasion and production are governed by the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guyton v. Novo Nordisk, Inc.*, 151 F. Supp. 3d 1057, 1067 (C.D. Cal. 2015), *aff'd sub nom. Guyton v. Novo Nordisk A/S*, 696 F. App'x 246 (9th Cir. 2017). Under *McDonnell Douglas Corp.*, the plaintiff has the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802–04. Once a prima facie case is shown, a presumption of discrimination arises, and the burden shifts to the defendant to show that the adverse employment action was taken for a legitimate, non-discriminatory or non-retaliatory reason. *See Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032, 1048 (S.D. Cal. 2019), *aff'd*, 814 F. App'x 194 (9th Cir. 2020). Stating a legitimate, non-discriminatory, non-retaliatory reason negates the presumption of discrimination and shifts the burden back to the plaintiff to demonstrate that the proffered reason was pretext for discrimination. *Id.*

"When an employer moves for summary judgment, however, 'the burden is reversed . . . because the defendant who seeks summary judgment bears the initial burden.'" *Dep't of Fair Emp. and Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999)). To prevail on summary judgment, a defendant employer is "'required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim, or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment.'" *Id.* (quoting *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1247 (2008)).

/ / /

---

[1]     "In evaluating FEHA discrimination and retaliation claims, California courts look to federal precedent governing analogous federal laws," like Title VII. *Guyton v. Novo Nordisk, Inc.*, 151 F. Supp. 3d 1057, 1067 (C.D. Cal. 2015), *aff'd sub nom. Guyton v. Novo Nordisk A/S*, 696 F. App'x 246 (9th Cir. 2017).

Once the defendant employer meets its initial burden, the plaintiff employee seeking to avoid summary judgment must demonstrate either that the defendant's showing was in fact insufficient or that there was a triable issue of fact material to the defendant's showing. *Id.* (citing *Hanson*, 74 Cal. App. 4th at 225).  The plaintiff employee can satisfy its burden "by produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual."  *Id.*  The plaintiff employee "may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998), *as amended* (Aug. 11, 1998) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).  "If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence 'must be specific' and 'substantial.'"  *Lucent*, 642 F.3d 728 at 746 (quoting *Godwin*, 150 F.3d at 1221).  It is insufficient for a plaintiff employee to demonstrate that the employer's decision was wrong, mistaken, or unwise; "'[r]ather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons.'" *Id.* (quoting *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000)).

## A.   *Plaintiff's Prima Facie Case for Retaliation*

The elements of a prima facie case of retaliation under FEHA are (1) the plaintiff engaged in a protected activity, (2) his employer subjected him to an adverse employment action, and (3) there is a casual link between the protected activity and the employer's action.  *See Greer v. Lockheed Martin Corp.,* 855 F. Supp. 2d 979, 986 (N.D. Cal. 2012).  As to the first element, the Parties agree that Plaintiff made a request for accommodation through Sedgwick on March 2, 2021.  (Jt. Stmt. No. 203.)  This is a protected activity, as FEHA makes it "unlawful for an employer to retaliate or otherwise discriminate against a person for requesting accommodation . . . regardless of whether the request was granted."

*Ruiz v. ParadigmWorks Grp., Inc.*, 787 F. App'x 384, 386 (9th Cir. 2019) (citing *Moore v. Regents of the Univ. of Cal.*, 248 Cal. App. 4th 216, 246 (2016)).  As to the second element, the parties agree that Defendant terminated Plaintiff's employment on March 4, 2021.  (Jt. Stmt. No. 213.)

Defendant contends, however, that Plaintiff cannot establish the third element of her prima facie case, causation.  (Mot. at 20:5–6.)  "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

### 1.    Knowledge

Defendant argues that Plaintiff cannot establish a causal connection between Plaintiff's request for accommodation and her termination because Champey made the decision to terminate Plaintiff's employment on March 1, 2021, and Plaintiff did not request accommodation until March 2, 2021.  (Mot. at 1:13–17.)  Champey states in his affidavit that he commenced Plaintiff's *evaluation* on March 1, 2021, (ECF No. 18-5 ¶ 31), but that he "[couldn't] recall the exact date[,]" (*id.* at 9), when he concluded that evaluation and decided to terminate Plaintiff's temporary employment.  Defendant conceded, however, that it did not start the administrative process to terminate Plaintiff until March 3, 2021, and completed that process on March 4, 2021.  (ECF No. 30-1 at 34:3–4; ECF No. 18-4 at 280.)  Thus, a reasonable factfinder could infer that Defendant decided to terminate Plaintiff's employment in the time between her March 2, 2021, accommodation request and the commencement of the administrative termination process on March 3, 2021.

Plaintiff asserts that Defendant had notice of Plaintiff's pregnancy-related accommodation request before it began the administrative process to terminate Plaintiff because (1) on March 1, 2021, Plaintiff informed the Store-level managers about her pregnancy, (Opp'n at 11:1–4, 21:5–8, 23:26–27); (2) the March 2, 2021 email from Sedgwick stated that Plaintiff was seeking accommodation for medical-related reasons, (*id.*

at 24:5–7); and (3) Fuentes-Uribe testified that "she was aware that Plaintiff was pregnant . . . because of the questionnaire" that Plaintiff submitted with her accommodation request. (*Id.*)

a.    Plaintiff's March 1, 2021 with Store-Level Managers

Plaintiff testified that on March 1, 2021, when she returned to work, she informed her manager that she had found out that she was pregnant while on her COVID-related leave of absence. (ECF No. 30 at 17:18–20; ECF No. 30-1 at 51:6–7.) Further, Plaintiff states in her affidavit that on March 1, 2021, she informed Champey, Moreno, and Rizko that she was pregnant and that she had passed out twice because of her medical issues, informed Human Resources of her medical note indicating her restrictions, and asked Rizko if she could be a greeter as an accommodation. (*Id.*)

Champey, Moreno, and Rizko, however, disavow any knowledge of Plaintiff's pregnancy on March 1, 2021, or at any time during her employment with Defendant. (ECF No. 18-4 at 193:11–18; ECF No. 18-13 ¶ 6; ECF No. 18-9 ¶ 13.) In his affidavit, Champey states that although Sedgwick contacted him about Plaintiff's accommodation request on March 2, 2021, (ECF No. 18-5 ¶¶ 34–35), he did not know about Plaintiff's pregnancy because Sedgwick's March 2, 2021 email did not disclose the underlying condition for Plaintiff's request. (*Id.*) Similarly, Moreno stated while she was aware that Plaintiff had contacted Sedgwick to request an accommodation on March 2, 2021, she did not know the underlying reasons for Plaintiff's accommodation request. (ECF No. 18-13 ¶ 8.) Further, Rizko stated that she did not know about Plaintiff's March 2, 2021 accommodation request during Plaintiff's employment with Defendant. (ECF No. 18-9 ¶ 15.)

Although Defendant disputes knowledge, the Court need not disregard Plaintiff's self-serving statement in her declaration that she had informed Champey, Moreno, and Rizko about her pregnancy when she returned from leave on March 1, 2021. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position. Although the source of the evidence may have some bearing

on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."). Nonetheless, Plaintiff cannot establish notice solely based on the March 1, 2021 events. First, Plaintiff identified the protected activity underlying her retaliation claim as her accommodation request for "no lifting over 20 lbs, sit as needed, stool/chair, and Temporary Alternative Duty," which she did not submit until March 2, 2021. (Opp'n at 21:5–8; Jt. Stmt. No. 203, *id.* No. 204.) Second, merely alerting supervisors on March 1, 2021, that she was pregnant is not the type of protected activity that will support a FEHA retaliation claim; while the statute protects "an employee who complains or otherwise seeks redress for discrimination she believes she has suffered, a retaliation claim does not lie on the basis of the alleged discrimination alone." *Johnson v. Proline Concrete Tools, Inc.*, No. CIV. 08-909 LKK/GGH, 2009 WL 1444204, at *7 (E.D. Cal. May 20, 2009) (citing *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978)).

### b.    Sedgwick's March 2, 2021 Email

Although the March 1, 2021, events alone are insufficient, combined with Sedgwick's March 2, 2021 email concerning Plaintiff's accommodation request, a reasonable factfinder could infer that Defendant had notice of Plaintiff's pregnancy-related accommodation request. Sedgwick's March 2, 2021 e-mail to Champey stated:

> This email is to notify you that, on 03/02/2021, your associate Ashley M. Bradshaw, called the Centralized Accommodation Program to request an accommodation, per the Accommodation in Employment (*Medical-Related*) Policy.

(ECF No. 18-6 at 19–21) (emphasis added). A reasonable factfinder could conclude that Sedgwick's email put Champey on notice of Plaintiff's pregnancy-related accommodation request because (1) it indicates that Plaintiff is seeking accommodation for medical reasons, (*id.*); and (2) Plaintiff conveyed the relevant "medical reasons" to the store-level managers on March 1, 2021—*i.e.*, that she was pregnant and had passed out twice because of her medical issues. (ECF No. 30-1 at 51:8–16.) Thus, Sedgwick's failure to disclose the underlying condition for Plaintiff's accommodation in its March 2, 2021 email is not

fatal to the issue of notice. Defendant has failed to meet its burden to show that Plaintiff cannot establish knowledge as it relates to the causation element of her prima facie case. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.), *as amended on denial of reh'g* (July 14, 1994) (observing that the amount of evidence that must be produced in order to create a prima facie case is "very little").

c.    The Questionnaire

Plaintiff also argues that Defendant was on notice of Plaintiff's pregnancy-related accommodation request before terminating her employment because Fuentes-Uribe testified that the questionnaire filled out by Plaintiff when requesting the March 2, 2021 accommodation "looks like it was a type of notice." (ECF No. 30 at 55:11–12.) Neither Plaintiff nor Defendant has submitted a copy of this disputed questionnaire. (*See generally* Docket.) Sedgwick's March 2, 2021 email, however, contains the following information about the questionnaire:

Immediate Action Required:

Accommodation Packet

The attached medical questionnaire of the accommodation packet *has been mailed to the associate*. The associate may also ask you to print the document for him/her. The associate will have 20 days to provide us a signed Medical Release and a *completed* Medical Questionnaire (other types of supporting medical documentation can be accepted). *If you are provided the documents*, please immediately fax them to us at 1-859-280-3264.

(ECF No. 18-6 at 19 (emphasis added).)

Based on the information provided about the accommodation packet, Plaintiff had twenty days to complete the questionnaire, or any other supporting medical documentation, and send it to Sedgwick or Defendant. (*Id.*) Other than Fuentes-Uribe's testimony, Plaintiff provides no further information about the timing of the questionnaire. (*See* Opp'n at 24.) Fuentes-Uribe's testimony that "it looks like it was a type of notice" does not inform the Court as to when Defendant received the questionnaire. (ECF No. 30 at 55:11–12.) The Parties do not dispute, however, that Plaintiff submitted her accommodation request

20

to Sedgwick on March 2, 2021,[2] (Jt. Stmt. No. 203), and, though Sedgwick's March 2, 2021 email does not reference any document (other than providing the deadline to submit supporting documentation), a reasonable factfinder could infer that Plaintiff had completed and submitted the questionnaire contemporaneously with her accommodation request.  As such, the timing of Plaintiff's March 2, 2021 accommodation request, in combination with Fuentes-Uribe's testimony confirming receipt of the medical questionnaire, could allow a reasonable factfinder to infer that Defendant was on notice of Plaintiff's pregnancy-related accommodation request before it initiated the administrative procedure to terminate Plaintiff's employment.    Thus,  the  questionnaire  independently  demonstrates  that Defendant has failed to meet its burden to show that Plaintiff cannot establish knowledge as it relates to the causation element of her prima facie case.

### 2.    *Timing*

A reasonable factfinder can infer causation "from timing alone where an adverse employment action follows on the heels of protected activity."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)).  The smaller the temporal gap between the protected activity and the adverse action, the stronger the inference of causation.  *See Dawson v. Entek Int'l*, 630 F.3d 928, 936–37 (9th Cir. 2011) (inferring causal relationship from a two-day gap between the protected activity and employment discharge); *see also Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1385 (W.D. Wash. 2019) ("Less than two months between Plaintiff's protected activity and termination is close enough in time to support an inference of causation.").  Here, Plaintiff requested an accommodation related to her pregnancy on March 2, 2021, (Jt. Stmt. No. 203), Defendant began the process of terminating Plaintiff's employment on March 3, 2021, (ECF No. 30-1 at 33–34), and Defendant concluded the

---

[2]    Although Plaintiff states in her declaration that she submitted the accommodation request on March 1, 2021, (ECF No. 30-1 at 51:8–16), the Court will accept the representation in the Joint Statement of Undisputed Material Facts that Plaintiff made the accommodation request through Sedgwick on March 2, 2021.  (Jt. Stmt. No. 203.)

termination process on March 4, 2021, (Jt. Stmt. No. 213).  Because Defendant terminated Plaintiff's employment only two days after she requested an accommodation, Plaintiff has established sufficiently close temporal proximity to support an inference of causation.

Accordingly, the Court finds that Defendant has failed to meet its burden to show that Plaintiff cannot establish the third element, causation, of her prima facie case for retaliation.

### B.    *Plaintiff's Prima Facie Case for Discrimination*

FEHA prohibits employment discrimination because of physical disability or medical condition.  *See Gardner v. Fed. Express Corp.*, 114 F. Supp. 3d 889, 896 (N.D. Cal. 2015) (citing Cal. Gov.'t Code § 12940(a)).[3]  "The elements of a prima facie case of disability discrimination in violation of FEHA are: (1) the plaintiff is disabled; (2) the plaintiff can, with or without reasonable accommodation, perform the essential functions of his position; and (3) the defendant subjected the plaintiff to an adverse employment action (4) because of the disability."  *Id.* (citing *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1246 (2008)).  As with a retaliation claim, a defendant moving for summary judgment can meet its burden by showing that "(1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment."  *Martinez v. Costco Wholesale Corp.*, 481 F. Supp. 3d 1076, 1090 (S.D. Cal. 2020) (citing *Avila*, 165 Cal. App. 4th at 1247).

Defendant argues that Plaintiff cannot establish that her termination was "because of" her pregnancy-related disability because Champey did not know about Plaintiff's pregnancy and there are non-discriminatory reasons for her termination.  (Mot. at 24:1–2.)

---

[3]     "[T]o claim entitlement to the protections afforded under section 12940 *et seq.*, [the plaintiff] must show she was subject to unlawful employment practices due to her sex (pregnancy) or physical disability. Under section 12945 [which supplements provisions of §12940], the employee must establish that she is either 'disabled by pregnancy . . . or related medical condition' or that, with the advice of her health care provider, she requested reasonable accommodations 'for a condition related to pregnancy . . . or related medical condition.'"  *Paleny v. Fireplace Prod. U.S., Inc.*, 103 Cal. App. 5th 199, 208, *review denied* (Sept. 18, 2024).

Thus, Defendant again argues Plaintiff cannot establish the causation element of her prima facie case.

For an employment termination decision to be "because of" of a disability, discrimination must have been a substantial factor motivating the employee's termination. *See Simms v. DNC Parks & Resorts at Tenaya, Inc.*, No. 1:13-CV-2075 SMS, 2015 WL 3912150, at *6 (E.D. Cal. June 25, 2015). To establish a prima facie case of discrimination, "an employee need only offer sufficient circumstantial evidence to give rise to a reasonable inference of discrimination." *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 310 (2010). Thus, as with a FEHA retaliation claim, proximity in time between the protected activity and adverse action is strong circumstantial evidence that the termination was because of the disability. *See Neumeyer v. Wawanesa Gen. Ins. Co.*, No. 14CV181-MMA RBB, 2015 WL 1924981, at *11 (S.D. Cal. Apr. 24, 2015) (concluding that the plaintiff established his prima facie case because he had provided sufficient circumstantial evidence that the employer terminated him less than one month after returning from a medical leave of absence due to his disability). Also as with a FEHA retaliation claim, "[a]n adverse employment decision cannot be made because of a disability when the disability is not known to the employer." *Martinez*, 481 F. Supp. 3d at 1090 (internal quotation omitted).

As discussed above, *see supra* Section I.A, Plaintiff has provided sufficient evidence from which a reasonable trier of fact could conclude that Defendant had notice of Plaintiff's pregnancy-related disability before initiating the administrative process to terminate her and that Plaintiff's termination two days after requesting medical accommodation due to her pregnancy was "because of" that pregnancy-related disability.

In light of the foregoing, the Court concludes that Defendant has failed to meet its burden to show that Plaintiff cannot establish her prima facie case for FEHA retaliation and discrimination.

### C.    *Defendant's Reasons for its Decision to Terminate Plaintiff's Employment*

As explained in Section I, an employer moving for summary judgment on FEHA claims can meet its initial burden by showing there was a legitimate, nondiscriminatory

reason for its decision to terminate plaintiff's employment.  *See Engel v. Time Warner Cable*, 847 F.App'x 405, 406–7 (9th Cir. 2021) (citing *Lucent*, 632 F.3d 728, 745).  Here, Defendant has come forward with evidence explaining both the timing and basis of its decision to terminate Plaintiff.  (Mot. at 26.)

Defendant contends that when Plaintiff was re-hired in September 2020, Champey had already decided that Plaintiff's temporary assignment would end once regular associates began to return from COVID leave.  (ECF No. 18-4 at 182:12–183:7; Jt. Stmt. No. 108.)  Additionally, around February 2021, when Plaintiff was on leave for COVID-related reasons, the Oceanside Store's Active Headcount was at 113.2% of Defendant's Headcount Guidance because of the return of regular associates from their COVID leave and the Store's over-hiring of temporary associates.  (*Id.* Nos. 155, 159.)  On February 8, 2021, Kish distributed a list of High Temp Stores, including the Oceanside Store, to various Market Managers, (*id.* No. 157; ECF No. 18-12 at 27), and directed them to "dive in and determine how [to] reduce this team headcount."  (*Id.*; Jt. Stmt. No. 162.)  The next day, on February 9, 2021, Fuentes-Uribe sent an email to Champey and Moreno with the subject line "2494 Temporary Associates Action" and provided the Workday Report.  (ECF No. 18-6 at 6; Jt. Stmt. No. 166.)  The Workday Report identifies Plaintiff by name, indicates that she entered the "supervisory organization" on May 31, 2020, and represents that she had been with Defendant for 253 days.  (ECF No. 18-6 at 6.)  Champey stated that he evaluated Plaintiff first out of fifty temporary associates because the Workday Report listed her as the longest-serving temporary employee.  (ECF No. 18-5 ¶ 21.)  Based on Defendant's custom and practice, however, Champey deferred his evaluation until after Plaintiff returned from leave.  (*Id.* ¶ 22.)

On March 1, 2021, Kish sent another email to various Market Managers regarding the over-hiring of temporary associates and noted that the listed stores, including the Oceanside Store, had "20+ more [temporary associates]" than the number of regular associates on a COVID-19 leave of absence.  (Jt. Stmt. Nos. 177, 182.)  Kish's March 1,

2021 list indicates that the Oceanside Store made some progress in addressing its over-hiring problem because the Store's Active Headcount had now been reduced to 109.7% of its Headcount Guidance. (*Id.* No. 178.) The Oceanside Store, however, still had twenty-three more temporary associates than it needed to cover for thirteen regular associates who were out on COVID-19-related leave. (*Id.* No. 180.) On March 1, 2021, Ahumada, one of the Market Managers, forwarded Kish's March 1, 2021 email to Champey and requested further information regarding the over-hiring of temporary associates. (ECF No. 18-6 at 8.) The same day, Champey responded to Ahumada with the following information:

> Hi Boss,
>
> Temporary Associates
>
> 36 Temporary Associates, *1 being terminated tomorrow.*
> 19 Associates on LOA
> 16 Temp Associates over HC Guidance
>
> All temporary associates are *being evaluated for a permanent position or end temp assignment. Hiring is cut off.* We will also be scheduling part time hours to align total store schedules as we work through the conversions.

(ECF No. 18-6 at 8 (emphasis added).) Champey stated that it was Ahumada's March 1, 2021 e-mail that prompted him to begin his evaluation of Plaintiff, who had returned from leave that same day, and, based on the notation in the email— "1 being terminated tomorrow"—Champey estimated that he had decided to end Plaintiff's temporary assignment on March 1, 2021. (Mot. at 14:13–18; ECF No. 18-5 ¶¶ 27, 30, 31.) Champey further testified that this estimation is supported by the fact that Plaintiff was the only temporary associate whose assignment ended between March 1 and March 4, 2021. (Jt. Stmt. No. 190; ECF No. 18-5 ¶ 30.) Defendant has therefore produced substantial responsive evidence that Plaintiff was terminated as part of a general effort to reduce its number of temporary employees.

When deciding which employees to terminate as part of its workforce reduction efforts, Champey also considered employees' work performance. (Mot. at 14:5–7; ECF

No. 18-5 ¶¶ 28, 29; ECF No. 18-6 at 2.)  Champey, as Store Manager, and Rizko, as an Assistant Manager, testified that they had observed Plaintiff's poor job performance.  (ECF No. 18-4 at 171:22–23, 173, 188:18–189:21, 192, 205:22–206:17; ECF No. 18-9 ¶¶ 10–11).  Specifically, Rizko stated in her declaration that Plaintiff, when working as a personal shopper, had been "very slow to complete her work tasks and often took too long to fulfill her job duties."  (ECF No. 18-9 ¶ 10.)  Rizko further stated that when Plaintiff had worked as a greeter, Plaintiff "was hardly at her assigned post and could not stay on task," resulting in "customers and Walmart's employees constantly [having] to ask for another person to assist."  (*Id.* ¶ 11.)  After observing Plaintiff as both a personal shopper and greeter, Rizko had "had multiple conversations with [Plaintiff] regarding her unsatisfactory work performance, but [Plaintiff] failed to improve."  (*Id.* ¶¶ 10, 11.)  Similarly, Champey testified that when Plaintiff had been working at the health ambassador station, Plaintiff "was hardly at the post.  We always had to find her."  (ECF No. 18-4 at 171:22–23.)  As a result, people "constantly had to buzz the button and ask for somebody to help.  We talked to [Plaintiff] multiple times about it."  (*Id.* at 188:23–25, 189:1.)  As such, Defendant has produced substantial responsive evidence of Plaintiff's poor performance during her employment.

An employer may legitimately terminate an employee due to poor performance or as part of a general effort to reduce its number of employees.  *See Erickson*, 417 F. Supp. at 1380 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000)); *see also Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir.), *as amended* (July 18, 2002).  Thus, Defendant has met its burden of providing a legitimate, nondiscriminatory reason for Plaintiff's termination.

### D.  Pretext

Because Defendant has provided a legitimate, nondiscriminatory explanation for terminating Plaintiff's employment, the burden shifts to Plaintiff to prove that Defendant's proffered explanation is pretext.  *See Chisolm*, 383 F. Supp. 3d at 1048.  "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered

explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000) (citing *Godwin*, 150 F.3d at 1220–22 (1998)).

Plaintiff has not presented direct evidence of discrimination, such as comments from her supervisors betraying bias or animus. *See Chisolm,* 383 F. Supp. 3d at 1048 (explaining that "direct evidence is evidence which, if believed, proves the fact of animus without inference or presumption" (citing *DeJung v. Super. Ct.,* 169 Cal. App. 4th 533, 550 (2008))). Instead, Plaintiff relies on circumstantial evidence to attack Defendant's proffered explanation for terminating Plaintiff's employment. (*See* Opp'n at 26–27.) "[T]o show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004). Here, Plaintiff challenges Defendant's proffered nondiscriminatory and nonretaliatory explanation on four grounds: (1) Champey's claim that he decided to terminate Plaintiff when she was rehired on September 15, 2020 is inconsistent and contradictory; (2) Plaintiff was not really the longest-serving temporary employee in Defendant's Workday Report; (3) Plaintiff was the only person in Defendant's Workday Report who was pregnant and requesting accommodations; and (4) Plaintiff did not have performance issues. (Opp'n at 22–23.)

### 1. Champey's Testimony

Plaintiff argues that the following two assertions made by Champey are contradictory: first, Champey testified that, in anticipation of the return of the regular associates from COVID leave, he had already decided that he would later terminate Plaintiff when he re-hired her on September 15, 2020; and second, Champey stated in his March 1, 2021 email to Ahumada that "[a]ll temporary associates are being evaluated for a permanent position or end temp assignment." (Opp'n at 22:1–7.) Thus, Plaintiff claims Champey's explanation is pretextual. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) (When an employer gives inconsistent explanations regarding its

reasons for terminating an employee, a factfinder may reasonably infer that the articulated reasons are pretextual).

Defendant provides recently hired temporary associates with a Temporary Associate Welcome Letter that details the terms of their temporary employment. (ECF No. 18-5 ¶ 6; ECF No. 18-6 at 1–4.) Although Defendant did not guarantee continued employment to any at-will temporary employees, (ECF No. 18-5 ¶ 5), it had a policy of identifying those eligible for conversion to regular full-time or part-time status from the temporary employee pool. (ECF No. 18-6 at 2.) Accordingly, the Temporary Associate Welcome Letter identifies the objective criteria—working scheduled hours, satisfactory job performance, and business needs—used by store-level managers to identify temporary associates eligible for conversion. (*Id*.) When evaluating temporary associates, Defendant's managerial staff selects employees for retention or termination based upon these objective criteria. (ECF No. 18-5 ¶ 9.)

As such, Champey's testimony regarding his state of mind when he hired Plaintiff on September 15, 2020 and his March 1, 2021 email to Ahumada concerning his evaluation of Plaintiff are not contradictory. Instead, they are complementary concepts because the former speaks to Defendant's hiring policy and the latter to its firing policy. Champey's testimony regarding his state of mind on September 15, 2020 reflects Defendant's standard policy of not guaranteeing employment to any temporary associate and his projection of Defendant's changing business needs as the COVID-19 pandemic, and the related leaves of absences, abated. Meanwhile, Champey's March 1, 2021 email to Ahumada confirms that before identifying Plaintiff as a candidate for termination, he followed Defendant's standard evaluation procedure.

Moreover, Plaintiff's assertion that her "understanding was that everyone was a temporary associate" and "then hired," (Mot. at 10; ECF No. 30 at 12), is insufficient to create a factual dispute because she does not provide any evidence to support her belief. *See Peay-Wainwright v. KQED, Inc.*, No. CV-92-4284 FMS, 1993 WL 393066, at *6 (N.D. Cal. Sept. 23, 1993) (finding that plaintiff's belief that no corporate economic difficulty

justified her termination did not establish pretext at summary judgment because she failed to provide any evidence to support her belief).  Accordingly, no reasonable factfinder could conclude that Champey's articulated reasons were contradictory and therefore pretextual.

### 2. Defendant's Identification of Plaintiff as the Longest-Serving Temporary Employee

Next, Plaintiff contends that she should not have been the "first-in-line for evaluation" since she was not the longest-serving temporary employee in the supervisory organization.  (Opp'n at 22:18–26.)   Plaintiff argues that her calculated length of employment in the Workday Report, 253 days, is incorrect because (1) Plaintiff was employed from September 28, 2020 to March 4, 2021, and (2) the Workday Report should have excluded from its calculation the days Plaintiff spent on leave from January 6, 2021 to February 28, 2021.  (Opp'n at 15:6–16.)

Plaintiff's first temporary assignment at the Oceanside Store lasted from May 31, 2020 to August 4, 2020, (*Id.* No. 91; ECF Nos. 18-4 at 265), and her second temporary assignment lasted from September 28, 2020 to March 4, 2021.  (Jt. Stmt. Nos. 104, 213; ECF No. 18-4 at 280.)  The Workday Report indicates that Plaintiff entered Defendant's organization on May 31, 2020, the date on which Plaintiff began her first temporary assignment, and that she had been with Defendant's organization for 253 days as of February 9, 2021.  (ECF No. 18-6 at 6.)  It does not exclude the time from August 4, 2020 to September 28, 2020 when Plaintiff was not employed by Defendant as a temporary associate.  (*Id.*)  Plaintiff asserts that if the Workday Report had accurately calculated the length of Plaintiff's second period of employment, excluding the time from August 4, 2020 to September 28, 2020, she would not have been classified as the longest-serving temporary employee in Defendant's organization and would not have been the first temporary associate evaluated by Champey on March 1, 2021.  (Opp'n at 15:6–8.)

Plaintiff cannot show pretext, however, by showing that the Workday Report was objectively false; instead, she must show a discriminatory motive for Defendant's actions. *See Flanagan v. City of Richmond*, No. 14-CV-02714-EMC, 2015 WL 5964881, at *17

(N.D. Cal. Oct. 13, 2015), *aff'd*, 692 F. App'x 490 (9th Cir. 2017) ("If Defendants honestly *believed* the Investigative Report's findings, then pretext would not be found absent evidence that Defendants 'did *not* honestly believe its proffered reasons.'" (emphasis in original) (quoting *Villiarimo*, 281 F.3d at 1063)). Here, Plaintiff's evidence supports only the inference that Defendant's Workday Report was objectively false.

First, without further evidence from Plaintiff, a reasonable juror could not conclude that Defendant had selected May 31, 2020, instead of September 28, 2020, as Plaintiff's date of entry into the supervisory organization with discriminatory intent. The Parties agree that Fuentes-Uribe did not "input, change, or in any way manipulate the information populated in the Workday Report," (Jt. Stmt. No. 167), and that Plaintiff began her first temporary assignment on May 31, 2020, (Jt. Stmt. No. 91). This leads to an inference of error, not discrimination. Further, because the uncontroverted evidence shows that Defendant identified Plaintiff as the longest-serving temporary employee in the Workday Report on February 9, 2021, (*id.* No. 166; ECF No. 18-12 at 31), weeks before she informed her store-level managers about her pregnancy on March 1, 2021, (ECF No. 30-1 at 51:8–16), or submitted her accommodation request on March 2, 2021, (Jt. Stmt. No. 203), no reasonable factfinder could conclude that Defendant applied its policy regarding length of service in a discriminatory or retaliatory manner. *See Anderson v. City & Cnty. of S.F.*, 169 F. Supp. 3d 995, 1017–18 (N.D. Cal. 2016) (rejecting the plaintiff's challenges to the defendants' internal investigation because the plaintiff pointed to no evidence that supported an inference that the investigation had violated employer policy or that the defendants had employed investigatory techniques that were different from those used in similar situations).

Plaintiff also argues that the Workday Report should have excluded from its calculation the days Plaintiff spent on leave from January 6, 2021 to February 28, 2021. (Opp'n at 15:6–16.) To address the exigencies of the COVID-19 pandemic, Defendant introduced a new leave policy that permitted Defendant's employees to take three types of leave—Levels 1 through 3. (ECF No. 18-7 at 5 ¶¶ 29–32.) According to Defendant, Level

3 was reserved for employees who took a leave of absence because they had a confirmed case of COVID-19, while neither Level 1 nor Level 2 related to a medical condition or disability. (*Id*.) While Defendant had a policy to toll a temporary assignment during *medical* leave, Defendant did not have a policy to toll an assignment period for a *personal* leave of absence. (ECF No. 18-11 ¶ 14.) As such, when Plaintiff took her leave on January 6, 2021 because she "c[ould]n't risk getting COVID," (ECF No. 18-4 at 81–82), as opposed to asserting that she had *gotten* COVID, she did not meet the criteria for a Level 3 leave of absence. (ECF No. 18-7 ¶¶ 30–32.) Because Plaintiff's leave of absence did not meet the Level 3 criteria, (*id.*), the Defendant did not have a policy of tolling Plaintiff's temporary assignment during that time. (ECF 18-11 ¶¶ 13, 14.)

Plaintiff raises two issues regarding Defendant's leave tolling policies: (1) Defendant failed to provide any documents supporting its three levels of COVID leave, (Opp'n at 10 n.3), and (2) "Fuentes-Uribe testified that a temporary assignment is tolled while the associate is on approved leave." (*Id.* at 10:18–19 (citing ECF No. 30 at 40–42).) As for Plaintiff's first contention, not only did Kish testify to the existence of three different COVID leave levels, (ECF No. 18-7 ¶¶ 29–32; ECF No. 18-4 at 253:1–20), but Kish's testimony is corroborated by Kish's February 8, 2021 email that specifies "L1," "L2," and "L3" as three distinct categories preceding "Total COVID LOA" in a table conveying employee headcount data. (ECF No. 18-8 at 9.) Further, Defendant's failure to provide a written company-wide policy on COVID leave, without more, does not support an inference of a discriminatory or retaliatory motive. *See Wofford v. Safeway Stores*, 78 F.R.D. 460, 470 (N.D. Cal. April 11, 1978) ("[I]n the absence of an allegation that the impact of [the employer's unwritten grooming policy] falls unevenly on persons similarly situated, th[e c]ourt cannot say that its scope, form, or manner of adoption were improper.") Here, the evidence before the Court could not lead a reasonable factfinder to conclude that Defendant applied its COVID leave policies to Plaintiff in a discriminatory manner.

Moreover, Fuentes-Uribe's testimony does not contradict Defendant's established policy. During her deposition, Plaintiff's counsel presented Fuentes-Uribe with a

hypothetical concerning an employee on medical leave (taking a leave of absence to received cancer treatment), to which she responded that the hypothetical employee's temporary assignment would be tolled while she was on approved leave. (ECF No. 30 at 40:4–42:6.) Based on Fuentes-Uribe's response, Plaintiff argues that Defendant had a policy "that an associate cannot be terminated if they are in the middle of an accommodation request, even for a legitimate reason unrelated to the request." (Opp'n at 15:22–24.) In making this argument, Plaintiff selectively quotes from and mischaracterizes Fuentes-Uribe's deposition testimony, ignoring that when Fuentes-Uribe was asked whether she "c[ould] terminate someone for a legitimate reason unrelated to a request for accommodation," she responded, "yes." (ECF No. 23-3 at 6:25–7:5.) In any event, unlike the employee being treated for cancer in Plaintiff counsel's hypothetical, Plaintiff's accommodation request on January 6, 2021 was not for medical reasons under Defendant's policy. Although Plaintiff argues that her request was based on her doctor's instructions to take two weeks off because she had COVID symptoms and feared exposing her grandmother to COVID, (Opp'n at 9:17–19; ECF No. 30-1 at 50:26–51:5), Plaintiff does not claim that she communicated to Sedgwick that the leave was for medical reasons, and Plaintiff conceded that she understood the difference between requesting a personal leave of absence and requesting medical leave. (Jt. Stmt. No. 150.) Consequently, Plaintiff has not offered any evidence to show that she was on medical leave such that her temporary assignment period should have been tolled under Defendant's policies.

In conclusion, the evidence taken in the light most favorable to Plaintiff shows that Defendant generated a report in which Plaintiff was identified as the longest-serving temporary employee, based on an impartial application of Defendant's leave tolling policies, before Plaintiff informed Defendant about her pregnancy or asked for pregnancy-related accommodations. Even if Defendant made an error in calculating Plaintiff's length of temporary employment, Plaintiff has failed to introduce evidence that Defendant did not "honestly believe[]" that she was the Oceanside Store's longest-serving temporary

employee. *Villiarimo*, 281 F.3d at 1063 (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)).

### 3.    *Plaintiff as the Only Pregnant Employee Requesting Accommodation*

Plaintiff also attempts to prove pretext by contending that she was the only person in the Workday Report who was pregnant and had requested an accommodation. (Opp'n at 27:12–13.) Defendant counters that this assertion further negates an inference of pretext because Defendant did not treat similarly situated employees outside Plaintiff's protected class more favorably than it treated Plaintiff. (Reply at 7:16–21 (citing *Anderson v. Fresno Cnty.*, 342 F. App'x 255, 258 (9th Cir. 2009)).)

A showing that a defendant employer treated similarly situated employees outside of a plaintiff employee's protected class more favorably is probative of pretext. *See Vasquez*, 349 F.3d at 641. On the other hand, a showing that similarly situated employees were treated in a like manner to the plaintiff employee negates an inference of pretext. *See Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982). At the time that the Workday Report was generated, however, Defendant had not yet informed Defendant of her pregnancy or asked for pregnancy-related accommodations, (Jt. Stmt. No. 166, 201), and as such, there is no evidence in the record to suggest that the Defendant knew she was a member of a protected class. Therefore, viewing this allegation in the light most favorable to Plaintiff, it amounts only to weak circumstantial evidence of Defendant's discriminatory or retaliatory intent. *See Opara v. Yellen*, 57 F.4th 709, 724 (9th Cir. 2023) ("Where abundant and uncontroverted independent evidence suggests that no discrimination occurred, plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000))).

Further, Defendant's evidence shows that between February 8, 2021 and March 1, 2021, the Oceanside Store addressed its over-hiring problem by reducing the number of temporary and regular associates that it employed. (ECF No. 18-5 ¶ 23.) During that time, the number of temporary associates at the Oceanside Store was reduced from forty-nine to

thirty-six and the number of regular associates was reduced from 301 to 294. (*Id.*) Thus, Plaintiff's subjective belief that, because of her pregnancy, she was the only employee selected for termination is not probative of pretext. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (noting that merely denying the credibility of the defendant's proffered reason for the challenged employment action or relying solely on the plaintiff's subjective beliefs that the action was unnecessary are insufficient to show pretext).

### 4. *Plaintiff's Job Performance*

Plaintiff challenges Defendant's assertion that her job performance was unsatisfactory because (1) she was never disciplined and/or coached for performance issues, (ECF No. 30-1 at 51:24–25); (2) there are no supporting documents regarding Plaintiff's poor performance, (*id.* at 6:8–17); (3) Fuentes-Uribe testified that she did not recall that Plaintiff had been disciplined or had had any performance issues, (ECF No. 30 at 35:16–36:5); and (4) Champey testified that he did not recall telling Fuentes-Uribe that Plaintiff should be terminated because of performance issues, (ECF No. 30-1 at 9:8–16). (*See* Opp'n at 13:7–15.)

It is undisputed, however, that while "evaluating a temporary associate's job performance, store management considers a temporary assignment comparable to a probationary period in which the temporary associate is not subject to formal warnings or discipline, or formal performance evaluations." (Jt. Stmt. No. 31.) Consequently, because Plaintiff was a temporary associate, the fact that Defendant did not provide Plaintiff with formal warnings or other performance-related documentation does not support the conclusion that Plaintiff's termination was pretextual.

Further, Plaintiff once again selectively quotes from Fuentes-Uribe's testimony. When asked whether Plaintiff was ever "disciplined for anything" or "had any performance issue," Fuentes-Uribe testified, "[n]ot that I recall." (ECF No. 30 at 35:16–36:5.) When Plaintiff's counsel inquired next about the reasons for Plaintiff's termination, however, Fuentes-Uribe testified that Defendant terminated Plaintiff's employment because her

"assignment [had] ended" and that the decisions regarding termination and conversion of temporary assignments were made at the store level by the store manager.  (*Id.* at 36:6–25.)  It is undisputed that Fuentes-Uribe is Defendant's Regional Director of Human Resources in Region 57, not a store-level manager.  (Jt. Stmt. No. 80.)  Meanwhile, store-level managers Champey and Rizko each testified to Plaintiff's poor performance.  (*See* Section I.C, *supra*; *see also* ECF No. 18-4 at 171:22–23, 173, 188:18–189:21, 192, 205:22–206:17; ECF No. 18-9 ¶¶ 10–11.)

Fuentes-Uribe's lack of knowledge regarding Plaintiff's performance is not indicative of pretext.  The record indicates that Fuentes-Uribe's primary role in Defendant's workforce reduction efforts at the Oceanside Store was to identify possible candidates for termination to Champey, who in turn determined which employees to terminate after considering their job performances and the Oceanside Store's needs.  (Jt. Stmt. No. 164; ECF No. 18-6 at 6.)  Thus, at best, Fuentes-Uribe's inability to recall Plaintiff ever being disciplined for poor performance, (ECF No. 30-1 at 35:20), amounts only to weak circumstantial evidence of Defendant's discriminatory or retaliatory intent and is therefore insufficient to demonstrate pretext.  *See Opara*, 57 F.4th at 724 (concluding that plaintiff's creation of a weak factual issue as to pretext will not suffice to defeat defendant's motion for summary judgement); *see also Gunzenhauser v. Garland*, No. 3:22-CV-03406-WHO, 2024 WL 1120385, at *6 (N.D. Cal. Mar. 14, 2024) (dismissing illogical assertions unsupported by the record as weak and insufficient to preclude summary judgment).  Accordingly, the Court finds that Plaintiff has failed to establish that Defendant's explanation regarding Plaintiff's unsatisfactory job performance was pretextual.

### E.     Conclusion

In *Aragon v. Republic Silver State Disposal Inc.*, an at-will employee who was assigned to jobs on an "as needed" basis brought an employment discrimination action following termination necessitated by the employer's "seasonal downturn."  292 F.3d 654, 657–58 (9th Cir.), *as amended* (July 18, 2002).  Like Defendant here, the defendant

employer in *Aragon* asserted that it had considered job performance in deciding which employees to terminate. *Id*. at 661. Although the court determined that the plaintiff employee had produced sufficient evidence to establish a prima facie case of discrimination, the court ultimately concluded that the plaintiff employee failed to offer "specific and substantial evidence" of pretext because he had offered no evidence to contradict the defendant employer's demonstrated need for workforce reduction or the plaintiff's "less than stellar" job performance. *Id.* at 661. Further, the court found that several of the plaintiff employee's arguments were based on his subjective beliefs regarding discrimination, which was inadequate to rebut the defendant employer's proffered nondiscriminatory reasons for terminating his employment. *Id*. at 661–64.

While Plaintiff has produced sufficient evidence to state a prima facie case for retaliation and discrimination, like the plaintiff in *Aragon*, she has failed to put forward specific and substantial evidence challenging the credibility of Defendant's motives for her termination. *See id*. In that regard, Plaintiff's evidence on the issue of pretext does not fare any better than the evidence offered by the plaintiff in *Aragon*. Thus, Plaintiff's retaliation and discrimination claims fail as a matter of law. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's first cause of action for FEHA discrimination and third cause of action for FEHA retaliation.

## II.    Failure to Accommodate (Claim 1)

Pursuant to the FEHA, it is unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee." Cal. Gov't Code § 12940(m). An employer, however, is not required to provide "an accommodation that is demonstrated by the employer . . . to produce undue hardship to its operation." *Id.* "Reasonable accommodation may include either . . . [m]aking existing facilities used by employees readily accessible to, and usable by, individuals with disabilities" or "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified

readers or interpreters, and other similar accommodations for individuals with disabilities." Cal. Gov't Code § 12926(n).

To prevail on a failure to accommodate claim, the plaintiff employee must establish that (1) the plaintiff has a disability under FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. *See Scotch v. Art Inst. of Cal.*, 173 Cal. App. 4th 986, 1010 (2009).

Here, Plaintiff's claims are premised on an accommodation request submitted on March 2, 2021. It is undisputed, however, that Plaintiff previously received and accepted a TAD to work as a greeter on December 2, 2020, (Jt. Stmt. Nos. 123, 124), in response to her submission of a Work Status Report on November 30, 2020 requesting restrictions of "no strenuous physical/mental activities and no lifting over 10 pounds." (ECF No. 18-10 at 4.) Under this TAD in the greeter position, the Parties agree that Plaintiff had access to a stool if she needed it. (Jt. Stmt. No. 126.) This undercuts the argument Plaintiff makes in her Opposition that "the existing December 2, 2020, TAD did not provide for sitting as needed or a stool/chair." (Opp'n at 29:6–8.)

Additionally, the Parties agree that a TAD remains in effect until management formally revokes it. (Jt. Stmt. No. 74.) There is no evidence in the record that Plaintiff's TAD from December 2, 2020, was ever formally revoked, and Defendant asserts that is because the TAD was not revoked prior to Plaintiff's termination on March 4, 2021. (*See* Reply at 14, 25–28.) While Plaintiff testified that "[a]t some point, [she] informed Defendant that [she] wanted to return to [her] position as a [P]ersonal [S]hopper," (ECF No. 30-1 at 50:23–25), it does not follow that she therefore "was no longer on the TAD since she had asked to be taken off of it," (Opp'n at 29:8–9), as it is undisputed between the parties that such a request, standing alone, is insufficient for a TAD to be revoked under Defendant's corporate policy. (*See* Jt. Stmt. No. 74.) The undisputed facts demonstrate that at the time of Plaintiff's second accommodation request on March 2, 2021, she was already under a TAD that accommodated her restrictions of "no strenuous physical/mental

activities and no lifting over 10 pounds," (ECF No. 18-10 at 4), and provided her access to a stool if she needed it. (Jt. Stmt. No. 126.)

Plaintiff's second accommodation request, submitted on March 2, 2021, requested "no lifting over 20 lbs, sit as needed, stool/chair, and Temporary Alternative Duty." (ECF No. 18-6 at 19.) In light of the undisputed facts, there is no genuine dispute regarding whether those requests had already been accommodated by Defendant. From December 2, 2020 until the end of Plaintiff's employment on March 4, 2021, Plaintiff was under a TAD that accommodated her request of "no lifting over 10 pounds," (Jt. Stmt. No. 123; ECF No. 18-10 at 4), and which provided access to a stool so she could sit as needed. (Jt. Stmt. No. 126.) Because no reasonable factfinder could conclude that Defendant failed to accommodate Plaintiff's request, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's first cause of action for failure to accommodate.

## III.    Failure to Engage in the Interactive Process (Claim 1)

FEHA imposes on employers a mandatory obligation to engage in an interactive process once an employee requests an accommodation for his or her disability, or when the employer itself recognizes the need for one. *See Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001). This interactive process "requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identifying an accommodation that allows the employee to perform the job effectively." *Schatz v. Flowers Baking Co. of Henderson, LLC*, No. 3:20-CV-00513-H-LL, 2021 WL 5921460, at *4 (S.D. Cal. Aug. 17, 2021). Whether the employer engages in an interactive process is a question of fact. *See Wilson v. Cnty. of Orange*, 169 Cal. App 4th 1185, 1193 (2009).

To prevail on a claim for failure to engage in the interactive process, the plaintiff employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred. *See Nealy*, 234 Cal. App. 4th at 379. "Liability hinges on the objective circumstances surrounding the parties' breakdown in

communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." *Salgado v. Iqvia*, 459 F. Supp. 3d 1318, 1334 (S.D. Cal. 2020).

Plaintiff submitted her accommodation request on March 2, 2021. (Jt. Stmt. No. 203.) In the two days before Defendant validly terminated Plaintiff's temporary employment, *see supra* Section I, the undisputed facts demonstrate that Defendant engaged in the interactive process with Plaintiff. After Plaintiff submitted her March 2, 2021 accommodation request to Sedgwick, Sedgwick sent an email to the Oceanside Store, including Champey, relaying the request. (*Id*. No. 204.) Sedgwick also responded to the request by sending Plaintiff a medical questionnaire and informing Plaintiff that she had 20 days to provide a signed medical release form and the completed medical questionnaire. (ECF No. 18-4 at 19.) This was all despite the fact that Plaintiff requested accommodations she was already receiving under her December 2, 2020 TAD. *See supra* Section II. There is no genuine dispute of material fact regarding whether Defendant failed to communicate in good faith, as the Parties agree that Sedgwick initiated the accommodation process and took steps to communicate with both Plaintiff and Defendant in the days between Plaintiff's request and the valid termination of her employment. (Jt. Stmt. No. 204). As such, no reasonable factfinder could conclude that Defendant effectively "slammed and locked the door." *See Hernandez v. Rancho Santiago Com. Coll. Dist.*, 22 Cal. App. 5th 1187, 1197 (2018). The Court therefore **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's first cause of action for failure to engage in the interactive process.

## IV.    Failure to Prevent Discrimination and Harassment (Claim 2)

Plaintiff also brings causes of action based on Defendant's alleged failure to prevent discrimination and harassment. (*See* Compl. ¶¶ 28–36.) Under FEHA, it is unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't. Code § 12940(k); *see Day v. Sears Holding Corp.*, 930 F. Supp. 2d 1146, 1993 (C.D. Cal. 2013) ("FEHA imposes an affirmative duty on employers to take all reasonable steps to prevent discrimination and harassment from occurring." (citing *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1073 (N.D. Cal. 2011))).

Because Plaintiff cannot establish that she was a victim of discrimination and/or harassment, *see supra* Section I, she cannot prevail on a claim that Defendant failed to take reasonable steps to prevent discrimination and harassment from occurring.  *See Lucent*, 642 F.3d at 748 (affirming summary judgment on the plaintiff employee's claim that the defendant employer failed to take all reasonable steps necessary to prevent discrimination because there was no viable claim for discrimination).  The Court therefore **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's second cause of action for failure to prevent discrimination and harassment.

## V.     Wrongful Termination in Violation of FEHA (Claim 4) and Public Policy (Claim 5)

Similar to Plaintiff's second cause of action, *see supra* Section IV, Plaintiff's fourth and fifth causes of action for wrongful termination in violation of FEHA and public policy, respectively, are derivative of Plaintiff's claim of discrimination under FEHA and therefore meet the same fate.  *See Charles v. Abercrombie & Fitch Stores, Inc.*, 684 F. App'x 670, 673 (9th Cir. 2017) (holding that the plaintiff employee's claim for wrongful termination in violation of public policy failed because it was derivative or her failed FEHA pregnancy discrimination claim); *see also Chisolm*, 383 F. Supp. 3d at 1069 ("If a discrimination claim fails, 'plaintiff's cause of action for wrongful termination in violation of public policy fails because it is derivative of plaintiff's statutory claim under Government Code §12940.'" (quoting *Sneddon v. ABF Freight Sys.*, 489 F. Supp. 2d 1124, 1131 (S.D. Cal. 2007))); *see also Charles v. Nike, Inc.*, 255 F. App'x 127, 129 (9th Cir. 2007) ("Finally, the public policy claim automatically fails because the FEHA claims fail." (citing *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007))).  The Court therefore **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's fourth cause of action for wrongful termination in violation of FEHA and fifth cause of action for wrongful termination in violation of public policy.

/ / /

/ / /

23-CV-593 TWR (BLM)

**VI.    Punitive Damages**

As Defendant is entitled to summary judgment on each of Plaintiff's underlying claims, *see supra* Sections I–V, the Court need not decide the question of whether this action could otherwise entitle Plaintiff to punitive damages.

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendant's Motion as to all of Plaintiff's causes of action.

**IT IS SO ORDERED.**

Dated:  January 8, 2025

Honorable Todd W. Robinson
United States District Judge

23-CV-593 TWR (BLM)